## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **CARL LEE HARDY** | : | **DOCKET NO.  2:12-cv-2840** |
| **VS.** | : | **JUDGE WALTER** |
| **U.S. COMMISSIONER OF SOCIAL SECURITY** | : | **MAGISTRATE JUDGE KAY** |

## REPORT AND RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of disability insurance benefits and supplemental security income benefits.  This matter has been referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

After review of the entire administrative record and the briefs filed by the parties, this court recommends that the Commissioner's decision should be AFFIRMED and this matter DISMISSED with prejudice.

### I.
### PROCEDURAL HISTORY

On September 14, 2009, plaintiff filed an application for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") alleging disability beginning on June 1, 2004.  Tr. 169-73, 174-76.  The period at issue here, however, begins on September 14, 2007, due to plaintiff's prior disability determination of not-disabled.[1]  He claimed disability due to

---

[1] In *Hardy v. Astrue, Comm. of Social Security,* No. 2:07-cv-2241 (W.D. La. 2009) plaintiff appealed a September 13, 2007, unfavorable decision of the Commissioner which this court affirmed.  The ALJ determined, with no

problems with his gallbladder, lower back, right leg, depression, and cholesterol.  Tr. 195.  The claims were initially denied on January 8, 2010.  Tr. 62-72.  Plaintiff requested and was granted an administrative hearing which was held on August 3, 2011.  Tr. 32-61.  Plaintiff was represented by an attorney at the hearing.

On August 12, 2011, the Administrative Law Judge ("ALJ") issued a partially favorable decision.  Tr. 12-26.  In his decision, the ALJ found that plaintiff was insured for purposes of DIB through December 31, 2009, and that he must therefore establish a disability on or before December 31, 2009, in order to be entitled to DIB.  The ALJ found that plaintiff was not disabled at any time through December 31, 2009, but did become disabled on March 1, 2010.  Thus, the ALJ determined that plaintiff was entitled to SSI beginning March 1, 2010.  *Id.*

On August 25, 2011, plaintiff filed a request for appellate review of this decision.  Tr. 10.  He submitted additional evidence to the Appeals Council in the form of a letter from Dr. Arthur W. Primeaux and a letter from Howard H. Hughes, Ph.D.  Tr. 1093, 1095.  On September 12, 2012, the Appeals Council denied his request for review.  Tr. 1-4.  On November 5, 2012, plaintiff filed suit in this court appealing the determinations of the Commissioner.  Doc. 1.

## II.
### FACTS AND MEDICAL EVIDENCE

### A.  Facts

Plaintiff was 54 years old on the date of the hearing which was held on August 3, 2011.  Tr. 43.  The record indicates that he worked from 1991 to 2004 as an operator at a chemical plant.  Tr. 196.  He stated that following gallbladder surgery he was on medical leave and was unable to return to this job.  *Id.*  He has a ninth grade education and some trade school training

---

objection from counsel for plaintiff, that the doctrine of *res judicata* applied to the period through September 13, 2007.  Tr. 16.

but does not have a GED.  Tr. 43, 48.  He is a veteran of the Marine Corps, honorably discharged in 1977.  Tr. 44.  He receives VA disability benefits due to a foot injury.  Tr. 44-45.

Plaintiff testified that he experiences a lot of pain in his legs and his back and has been very depressed due to the pain.  Tr. 49-50.  He stated that he cannot walk longer than 15 minutes without his legs burning and getting heavy and he cannot sit for longer than 15 minutes.  Tr. 51, 53.  He has been prescribed a walking cane that he uses regularly.  *Id.*  He also testified that he experiences constant burning and stinging back pain that that is somewhat relieved with his medication.  Tr. 52.  When he takes his medication he stated that he is able to perform small tasks around his house.  Tr. 53.  He testified that he is not able to carry more than 10 pounds without hurting his legs and back, has difficulty climbing stairs because he cannot lift his legs up high, and experiences pain in his back and legs when he twists and bends.  Tr. 54.  He also stated that when he goes to church on Sunday he has problems kneeling.  Tr. 55.  He has had problems and pain in his right foot since 1976 when he had surgery.  Tr. 55-56.  He experiences a throbbing pain in his foot when he is standing.  *Id.*

On a typical day plaintiff testified that he wakes up at 7:00 – 8:00 a.m., tends to his daily hygiene, and gets himself dressed.  Tr. 56.  He stated that he may start to perform a task but cannot finish because his "mind just goes."  *Id.*  He does not do housework or yard work regularly but on a good day he tries to do some yard work.  *Id.*  He lives with his sister and his niece who do most of the housework, cooking, and grocery shopping.  Tr. 57, 59.  He stated that he cannot go grocery shopping because his legs and back will not allow him to walk around the store.  Tr. 59.  He is able to make a sandwich and microwave a meal.  *Id.*

Plaintiff testified that he has suffered with depression and anxiety since 2004.  Tr. 57.  He takes medication that helps but he still prefers to be by himself in his room.  He described

himself as anti-social, stating that he no longer likes to go out or visit with friends.  Tr. 59-60. He stated that he has difficulty sleeping and takes medication for this, has decreased energy, has twice attempted suicide, and has difficulty concentrating.  Tr. 57-59.

### B.  Medical Evidence

#### 1.  Veterans Administration Medical Center

The record evidence reflects that plaintiff has received medical care through the Veterans Administration since at least 2005; however, as previously stated, the relevant time period for this determination began on September 14, 2007.  This summary is limited to information as it relates to the relevant period.

On November 26, 2007, plaintiff was seen at the VA where he complained of pain to his foot, abdomen, and lower back.   He stated that his prescribed pain medication was not controlling his pain.  The notes indicate that he was taking medication for gastroesophageal reflux disease, depression (which was stable with the medication), high cholesterol, insomnia, and pain.  The doctor discontinued his current pain medication and prescribed Morphine.  Tr. 793-99.  From December 2007 through April 2008 the records indicate that plaintiff received monthly refills of Morphine through the VA.  Tr.  791-92.

On April 28, 2008, plaintiff was seen for a routine follow up.  Complaints of pain were the same as in November and he reported having a cold.  The same medications were continued. Tr. 784-90.

On July 9, 2008, the VA received a phone call from plaintiff requesting prescriptions for Soma, Xanax and Lortab.  Plaintiff stated that he was prescribed these medications through his private doctor in Houston.  Plaintiff was advised that he broke his narcotic contract with the VA

by receiving other controlled prescriptions and that his prescription for Morphine would not be refilled through the VA until they conduct a review of his records from Houston.  Tr. 782.

Plaintiff underwent a compensation and pension examination on July 25, 2008, for purposes of an increase in his pension benefits.  He gave a history of excision of plantar fibroma of his right foot in 1976.  He reported that the area is tender and he experiences pain upon standing/ambulation in excess of 20 minutes.  The physical examination revealed a well healed scar and mild tenderness in the area.  There was no inflammation, edema or keloid formation and examiner's impression was that the ambulation limitation was not related to the scar.  Tr. 378-80.

The records indicate that plaintiff continued to receive monthly prescription refills for Morphine through February 2009.  Tr. 773-81.  He presented for follow up on September 29, 2008, and on March 30, 2009.  Tr. 775-81, 766-72.  At the March appointment plaintiff reported that he had been hospitalized for stomach issues and was prescribed Hydrocodone by his private doctor.  The VA put a "red flag" on his chart for violation of his narcotic contract and he can no longer receive Morphine from the VA.  *Id.*

At his scheduled visit on October 9, 2009, plaintiff complained of chronic pain and depression.  He stated that he could not afford his Morphine but needs it.  He reported that he was being prescribed Soma and Hydrocodone by his private doctor.  He noted an increase in his depression and asked for an appointment with mental health.  Tr. 758-64.  On October 22, 2009, plaintiff called the VA requesting pain and anxiety medication.  He was informed that he can no longer get this medication through the VA because of the violation of his narcotic contract.  He was also advised that his physician had requested a mental health consult. Tr. 757.

On January 29, 2010, plaintiff returned for a follow up and requested a back brace.  He complained of pain and requested to be back on pain management through the VA because his

private doctor would not increase his medication dosage.  The notes indicate that initially plaintiff was walking very slowly with a low tone of voice but when he was placed in the exam room he began to move better and used a strong tone of voice.  His pain was noted to be "questionable."  Tr. 741-46.  On February 23, 2010, plaintiff was issued a back brace and educated on proper wear and care.  Tr. 736.

On June 10, 2010, plaintiff presented for a routine follow up visit.  He stated that he continues to receive his pain medication from his private doctor and that the medication helps get his pain level down to a 5.  Tr. 720-30.

On November 5, 2010, plaintiff complained of back pain.  He reported that he recently underwent surgery and had stents placed in his left leg.  It was noted that his surgical wound had healed but he had limited range of motion due to the procedure.  Plaintiff's medications were assessed and he was prescribed a narcotic as his controlled substance violation flag was removed.  A lumbar MRI was within normal limits.  Tr. 490-98.

On both December 22, 2010, and February 22, 2011, nursing notes indicate that plaintiff called requesting a refill of his pain medication.  Tr. 486, 491.

### 2. VA Mental Health Treatment

Plaintiff was seen by Dr. Lyndon Greene on November 19, 2009, for an initial psychiatric visit.  He reported that he has been seeing a private doctor who was prescribing Prozac.  He stated that he lost his job in 2004 and has yet to receive disability.  He reported that he has no "get up and go."  He is also taking Xanax prescribed by a private physician and would like the VA to prescribe this medication.  Dr. Greene advised plaintiff that he is not allowed to have any controlled substance prescribed by the VA.  He reported that he sleeps about 2 hours at a time and is taking Seroquel.  Dr. Greene diagnosed mood disorder due to general medical condition,

sedative hypnotic dependency, and opiate dependency.  He noted that he would refer plaintiff to a psychologist and adjust his antidepressant medication. Tr. 753-57.

Plaintiff saw Dr. Greene again on January 8, 2010.  He reported that he was experiencing various financial problems.  Dr. Greene noted that he was fully alert and oriented, his mood was worried, he denied suicidal ideation and hallucinations.  His diagnosis remained the same and he discharged plaintiff back to primary care noting that plaintiff's medications have been adjusted and there is little more that he can do for plaintiff.  Dr. Greene noted that the cause for plaintiff's depression is finances and that he does not need any new medications because they will have little or no effect on that issue.  Tr. 750-51.

Plaintiff saw Howard H. Hughes, Ph.D., a psychologist, on January 8, 2010.  He reported low appetite, sleep difficulties, low energy, and low motivation.  His diagnosis was mood disorder due to pain with depressive features, opioid dependence, and sedative hypnotic dependence. His recommended course of therapy included stress management training and cognitive skills training which plaintiff completed on February 4, 2010, and March 4, 2010.  Tr. 746-47.  Plaintiff continued to treat with Dr. Hughes through May 19, 2011.  Tr. 483-91, 504-14, 717-39.

On July 14, 2011, Dr. Hughes prepared a medical source statement – mental wherein he opined that plaintiff had moderate limitations in his ability to understand, remember, and carry out short, simple instructions, his ability to interact appropriately with the public, supervisors, and co-workers, and his ability to respond appropriately to changes in a routine work setting.  He found marked limitations in his ability to understand, remember, and carry out detailed instructions, his ability to make judgments on simple work-related decisions, and his ability to respond appropriately to work pressures in a usual work setting.  Tr. 911-12.

On September 14, 2011 Dr. Hughes wrote a letter addressed "To Whom it May Concern" wherein he opined that his records indicate that plaintiff was disabled due to mood disorder related to chronic pain condition since prior to July 2007.  Tr. 1095.

### 3.  Arthur W. Primeaux, M.D.

Plaintiff saw Dr. Primeaux on September 22, 2008, for chronic pain.  He complained of severe pain in his lower back and down his right leg.  His prescribed medications included Alprazolam (Xanax), Hydrocodone, and Soma.  Tr. 243.  He returned on November 21, 2008, for a hospital follow up after an endoscopic retrograde cholangio-pancreatography was performed at St. Patrick Hospital on November 13, 2008.  Tr. 242, 244-45.

On April 29, 2009 plaintiff saw Dr. Primeaux to discuss his pain management.  He was prescribed Morphine and Xanax.  Tr. 241.  Nursing notes indicate that Hydrocodone, Lorcet, Xanax, Soma were prescribed on October 28, 2008, December 18, 2008, and January 12, 2009.  Tr. 242-43.

On July 5, 2011, Dr. Primeaux completed a medical source statement – physical wherein he opined that plaintiff could occasionally lift less than 10 pounds, required a hand held assistive device for ambulation, required alternate sitting and standing to relieve his pain, had limited ability to push or pull in his lower extremities.  He opined that plaintiff could occasionally crawl and never climb, balance, kneel, crouch or stoop.  Plaintiff was limited to occasionally reaching and handling but not limited in fingering or feeling.  Plaintiff's verbal/communicative skills were unlimited and there were no environmental limitations.  Tr. 516-19.

On August 31, 2011 Dr. Primeaux wrote a letter addressed "To Whom it May Concern" wherein he opined that plaintiff was disabled due to his chronic pain, lumbar back injury, and peripheral arteriosclerotic vascular disease since August 7, 2006.  Tr. 1093.

-8-

### 4. *Christus St. Patrick Hospital*

On September 23, 2009, plaintiff was admitted to St. Patrick Hospital complaining of abdominal pain and nausea.  He was diagnosed as having sepsis and subsequently had a urinary tract infection.  He was treated and released on September 29, 2009.  Tr. 341.

On October 11, 2010, plaintiff was seen by Dr. Michael DePuy complaining of right leg discomfort.  He reported that it has worsened over the past 6 months and is worse during exercise.  A physical exam showed trace edema in his ankles bilaterally and posterior tibial pulses were decreased in both lower extremities.  Further testing was recommended including a peripheral angiogram.  Tr. 1082.

On October 18, 2010, an abdominal aortogram and bilateral iliac arteriography study was performed.  The results showed severe peripheral vascular disease with total occlusion of the right and left superficial femoral artery.  Tr. 405-06.  On October 19, 2012 plaintiff underwent surgery on his left leg superficial femoral arteries.  Tr. 410.  Following the procedure, plaintiff left the recovery room and was found in a hospital elevator where it was discovered that he had ingested a handful of morphine pills in an attempt to commit suicide.  Tr. 413-14.  He was admitted for psychiatric care and discharged on October 27, 2010.  Tr. 913-34.

### 5. *Louisiana Office of Mental Health*

There is one entry from the Louisiana Office of Mental Health in the record dated November 20, 2010.  Plaintiff presented following his suicide attempt and was diagnosed with major depression.  The notes indicate that he was doing better since his discharge from the hospital.  Tr. 424-27.

### 6. *Lake Charles Memorial Hospital*

On February 24, 2011, an abdominal aortogram and bilateral selective lower extremity angiogram was performed. The results showed that there was no significant obstructive disease of the left extremity with the exception of a completely occluded anterior tibial with excellent two vessel runoff to the left foot. All stents previously placed in left superficial femoral artery were in place with excellent flow. The right superficial femoral artery was completely occluded but with very large collaterals with excellent and rapid flow into the popliteal and excellent flow from the popliteal to the foot. The right anterior tibial was also completely occluded.

The recommendation following the study was to refer plaintiff for consideration of a right sided femoropopliteal bypass. It was noted, however, that plaintiff complains of pain in both lower extremities but the left extremity does not have significant peripheral disease and has excellent flow through the stented areas and the collaterals on the right reconstitute the flow below the knee very well. The physician opined that plaintiff's lower back disease may be the cause of some of his symptoms. Tr. 454-55.

### 7. *Amanda Steen, M.D.*

Dr. Amanda Steen performed a consultative examination on November 21, 2009. Plaintiff gave a history of gallbladder problems, low back pain, right leg pain, depression, and hyperlipidemia. He stated that his hyperlipidemia is controlled with medication. His depression began in 2004 when he was no longer able to work; however, his depressed mood is helped with medication and he sees a psychiatrist. He reported that his gallbladder, back, and leg problems began after a cholecystectomy in 2004. He had pain radiating from the scar and in 2005 underwent scar revision and tissue adhesion lysis which helped with the pain. He has had steroid injection and a TENS unit for his back. He stated that he feels weakness in his legs with

prolonged walking and climbing and uses a cane in his right hand to take pressure off his leg.

Plaintiff reported that he can dress and feed himself, can stand for 20 minutes at a time and 3 hours in an 8 hour work day, can walk 15-20 minutes on level ground, and can sit for 15 minutes comfortably, and can lift 10 pounds.  He stated that he drives a car and participates in household chores such as sweeping, mopping, vacuuming, cooking, washing dishes and shopping.

Dr. Steen noted that plaintiff had no difficulty getting on and off the exam table, up or out of the chair, and dressing and undressing himself.  Upon examination she noted tenderness in the lumbar area and that he did not stand on his right leg.  He was able to bend at the waist, touch his toes, needed no assistive device for ambulation, and declined walking on his toes because of pain in his foot.  Plaintiff was able to walk on his heels without difficulty.  Dr. Steen noted that his gait was stiff and favored the left leg and that his grip was 5/5 bilaterally with normal dexterity and grasping ability.

Plaintiff's range of motion in all major joints was without limitation.  The straight leg raise test was negative bilaterally.  Plaintiff was noted to be mentally alert and oriented with motor function of 5/5 in all major muscle groups of the upper and lower extremities.  AP and lateral views of his lumbrosacral spine showed normal alignment with moderate endplate sclerosis and diffuse facet arthropathy and mild decreased disc space at L5-S1.

Dr. Steen opined that plaintiff was fully cooperative and her assessment following the examination and after review of his history, relevant imaging, and past medical records was that plaintiff had no physical impairments or functional activity limitations and required no assistive devices for ambulation.  Tr. 302-06.

### 8. *Judith Levy, Ph.D.*

A psychiatric review technique performed by Dr. Levy on December 30, 2009, indicates that plaintiff suffers from the affective disorder of depression, not severe.  She opined that he had no restrictions in activities of daily living, or episodes of decompression, and mild limitations in maintaining social functioning and maintaining concentration, persistence, and pace.  She noted that the medical evidence of record showed that plaintiff had a history of depression that is stable with medication.  Tr.311-24.

### 9. *Fred Ruiz, M.D.*

Dr. Ruiz completed a physical residual functional capacity assessment on January 7, 2010.  He determined that plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and walk for 6 hours in an 8 hour work day, sit for 6 hours in an 8 hour work day, and had unlimited push and pull ability.  Plaintiff was limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling.  He was limited to never climbing ladders, ropes, or scaffolds.  Plaintiff had no manipulative, visual, communicative, or environmental limitations.  He opined that plaintiff maintained the ability to perform light work both prior to the date last insured (December 31, 2009) and at present.  Tr. 326-34.

### 10. *Charles Murphy, M.D.*

Dr. Charles Murphy, a psychiatrist, completed a medical source statement - mental on August 2, 2011.  He opined that plaintiff was not limited in his ability to understand, remember and carry out instructions but was markedly limited in his ability to interact appropriately with supervisors and extremely limited in his ability to interact with the public and co-workers, respond to work pressures and changes in a routine work setting.  He diagnosed major depressive

disorder and opined that he was not able to stand or sit for more than 15 minutes at a time due to pain from his legs and back.  Tr. 1088-89.

### III.
#### STANDARD OF REVIEW

"In Social Security disability cases, 42 U.S.C. § 405(g) governs the standard of review." *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002) (citing *Frith v. Celebrezze*, 333 F.2d 557, 560 (5th Cir. 1964)).  The court's review of the ultimate decision of the Commissioner is limited to determining whether the administrative decision is supported by substantial evidence and whether the decision is free of legal error.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005) (citing *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994)).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Greenspan*, 38 F.3d at 236).  "It is 'more than a mere scintilla and less than a preponderance.'" *Id.* (quoting *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002)).  It is "such relevant evidence as a reasonable mind might accept to support a conclusion.  It must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

In applying the substantial evidence standard, the reviewing court critically inspects the record to determine whether such evidence is present, "but may not reweigh the evidence or substitute its judgment for the Commissioner's." *Perez*, 415 F.3d at 461 (citing *Greenspan*, 38 F.3d at 236; *Masterson*, 309 F.3d at 272).  Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed.  *Richardson v.*

*Perales*, 402 U.S. 389, 390 (1971).   "Conflicts of evidence are for the Commissioner, not the courts, to resolve."  *Perez*, 415 F.3d at 461 (citing *Masterson*, 309 F.3d at 272).

## IV.
## LAW AND ANALYSIS

### A. *Burden of Proof*

The burden of proving that he or she suffers from a disability rests with the claimant. *Perez*, 415 F.3d at 461.  The Social Security Administration defines a "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" lasting at least twelve months.  42 U.S.C. § 423(d)(1)(A).   The ALJ conducts a five-step sequential analysis to evaluate claims of disability, asking:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment[2]; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

*Id.* (citing 20 C.F.R. § 404.1520).  If the claimant meets the burden of proof on the first four steps, the burden shifts to the Commissioner on the fifth step to show that the claimant can perform other substantial work in the national economy.  *Id.*  "Once the Commissioner makes

---

[2] A severe impairment or combination of impairments limits significantly a claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).  Basic work activities are defined at 20 C.F.R. § 404.1521(b). The term severe is given a *de minimis* definition as found in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985). According to *Stone*, "[a]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."  752 F.2d at 1101 (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984)).

If a severe impairment or combination of impairments is found at step two, the impairment or combined impact of the impairments will be considered throughout the disability determination process.  20 C.F.R. §§ 404.1520, 404.1523.  A determination that an impairment or combination of impairments is not severe will result in a social security determination that an individual is not disabled.  *Id.*

this showing, the burden shifts back to the claimant to rebut this finding." *Id.* (quoting *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000)).

The analysis ends if the Commissioner can determine whether the claimant is disabled at any step. *Id.* (citing 20 C.F.R. § 404.1520(a)). On the other hand, if the Commissioner cannot make that determination, he proceeds to the next step. *Id.* Before proceeding from step three to step four, the Commissioner assesses the claimant's residual functional capacity (RFC). *Id.* "The claimant's RFC assessment is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record." *Id.* at 461-62 (citing 20 C.F.R. § 404.1545(a)(1)). Specifically, in determining a claimant's RFC, an ALJ must consider all symptoms, including pain, and the extent to which these symptoms reasonably can be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. § 404.1529; Social Security Ruling 96-8p. The ALJ must also consider any medical opinions (statements from acceptable medical sources) that reflect judgments about the nature and severity of impairments and resulting limitations. 20 C.F.R. § 404.1527, Social Security Rulings 96-2p, 96-6p. The claimant's RFC is considered twice in the sequential analysis—at the fourth step it is used to determine if the claimant can still do his or her past relevant work, and at the fifth step the RFC is used to determine whether the claimant can adjust to any other type of work. *Perez*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1520(e)).

Here, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act at any time through December 31, 2009 – the date last insured. He found that beginning on March 1, 2010 plaintiff became disabled and continued to be disabled through the date of his decision.

### B.  Plaintiff's Claims

In his appeal plaintiff argues that substantial evidence does not support the ALJ's decision.  Specifically, he sets forth the following assignments of error:

1.   The court erred in giving the consultative evaluation greater weight than the testimony of Mr. Hardy's treating physicians.

2.   The court erred in failing to consider the opinions of Mr. Hardy's treating physicians.

3.   The court erred in finding that Mr. Hardy was not disabled prior to March 1, 2010.

4.   The court erred in finding that Mr. Hardy could perform light duty work prior to March 1, 2010.

5.   The court erred in not considering the Medical-Vocational guidelines when this would have directed a finding of disabled.

We consider plaintiff's claims in the order in which they are raised.

### 1.  Did the ALJ consider and give the proper weight to plaintiff's treating physicians' opinions?

In assignments of error one and two, plaintiff argues that the ALJ erred in failing to properly weight to the opinions of plaintiff's treating physicians.  He asserts that the ALJ erroneously relied on opinions of non-treating physicians in finding him not disabled prior to March 1, 2010.  In response, the Commissioner argues that the ALJ properly weight all medical evidence of record and substantial evidence supports his determination that plaintiff's impairments did not prevent him from working from September 13, 2007, through March 1, 2010.

In assessing the medical evidence supporting a claim for disability benefits, the ALJ is bound by the "treating physician rule," which generally requires the ALJ to give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians.

*Blakely v Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir.2009).  The ALJ must give a treating physician's opinion "controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence' ". *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir.1995) (quoting 20 C.F.R. § 404.1527(d)(2).  A treating physician's opinion may be given little or no weight "when the evidence supports a contrary conclusion".  *Newton v. Apfel,* 209 F.3d 445 (5th Cir.2000).

In his opinion the ALJ gave great weight to the opinion of Dr. Fred Ruiz who opined that prior to his date last insured plaintiff was able to perform light work with the restrictions of occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling and never climbing ladders, ropes, or scaffolds.  The ALJ noted that Dr. Ruiz's RFC assessment was based in part on Dr. Steen's consultative exam and was supported by the record as a whole.

Dr. Steen's physical exam revealed that plaintiff was able to bend at the waist, touch his toes and needed no assistive device for ambulation.  He had no difficulty getting on and off the exam table, up or out of the chair, and dressing and undressing himself.  Plaintiff was able to walk on his heels without difficulty, his grip was 5/5 bilaterally with normal dexterity and grasping ability, his range of motion in all major joints was without limitation, and the straight leg raise test was negative bilaterally.  Dr. Steen noted that plaintiff was mentally alert and oriented with motor function of 5/5 in all major muscle groups of the upper and lower extremities and studies of his lumbrosacral spine showed normal alignment with moderate endplate sclerosis and diffuse facet arthropathy and mild decreased disc space at L5-S1.  Dr. Steen also noted that plaintiff drives a car and participates in household chores such as sweeping, mopping, vacuuming, cooking, washing dishes and shopping.

The ALJ also gave great weight to the opinion of Dr. Judith Levy who opined that the medical evidence of record showed that plaintiff had a history of depression that was non severe and stable with medication.

While plaintiff maintains that it was error for the ALJ to disregard the opinions of his treating physicians, Dr. Primeaux, Dr. Hughes, and Dr. Murphy, the record reflects that none of these doctors' opinions relate to the period prior to March 1, 2010.  Dr. Primeaux's opinion was rendered on July 5, 2011, Dr. Hughes' opinion on July 14, 2011 and Dr. Murphy's on August 2, 2011.  The ALJ's opinion reflects that he did indeed consider and rely on the opinions of Dr. Primeaux, Dr. Hughes, and Dr. Martin in reaching his determination that plaintiff was disabled beginning March 1, 2010.

Additionally, the court finds that Dr. Primeaux's letter dated August 31, 2011 and Dr. Hughes' letter dated September 1, 2011, which were both submitted to the Appeals Council and are properly before this court on review,[3] are not entitled to any weight because each letter renders an opinion on the "disability" of plaintiff - a legal issue specifically reserved for the Commissioner.[4]   *Frank v Barnhart,* 326 F.3d 618 (5th Cir. 2003)("Among the opinions by treating doctors that have no special significance are determinations that an applicant is 'disabled' or 'unable to work.' These determinations are legal conclusions that the regulation describes as 'reserved to the Commissioner.'").

Thus, we find that the ALJ properly considered all relevant opinions in making his determination that plaintiff was not disabled prior to March 1, 2010 and find that plaintiff's first two assignments of error lack merit.

---

[3] Evidence submitted for the first time to the Appeals Council is considered part of the record upon which the Commissioner's final decision is based.  *Higginbotham v. Barnhart,* 405 F.3d 332, 337 (5th Cir.2005).

[4] Dr. Primeaux's letter states that plaintiff "has been disabled" due to his impairments since August 7, 2006. Tr. 1093.  Dr. Hughes' letter states that plaintiff "has been disabled" due to mood disorder since prior to July 2007. Tr. 1095.

### 2. Does substantial evidence support the ALJ's determination that prior to March 1, 2010 plaintiff maintained the RFC to perform light work and was thus not disabled?

In assignments of error three and four plaintiff argues that the ALJ erred in finding that he was capable of performing light work prior to March 1, 2010.  Plaintiff maintains it was error for the ALJ not to accept the July 5, 2011 assessment performed by Dr. Primeaux which limited plaintiff to a reduced level of sedentary work.  The Commissioner contends that the totality of the evidence of record during the relevant period of September 14, 2007, through March 1, 2010, supports the ALJ's RFC assessment.

Residual functional capacity, as it is used in the regulations, designates the ability to work despite medically determinable impairments.  *See generally* 20 C.F.R. § 404.1545(a).  *Hollis v. Bowen,* 837 F.2d 1378, 1386 –1387 (5th Cir.1988).  A person's residual functional capacity is based on the totality of the evidence and the ALJ is responsible for making that determination. 20 C.F.R. § 404.1546(c).

In his opinion the ALJ accepted the RFC assessment of Dr. Ruiz and found that prior to March 1, 2010, plaintiff had the RFC to perform light work except he was restricted from climbing ladders, ropes and scaffolds and was limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling.  Before reaching his decision, the ALJ thoroughly discussed plaintiff's medical history and considered his hearing testimony.  He noted that plaintiff's treatment during the period at issue was "essentially routine and conservative in nature."  Tr. 23.  He noted that plaintiff's reported daily activities during the period at issue included driving a car, sweeping, mopping, vacuuming, cooking, washing dishes, and shopping, and that Dr. Steen's November 21, 2009 evaluation found that he was not functionally limited in any manner.  *Id.*

The court finds that the evidence of record supports the ALJ's decision.  Again, we note that the report which plaintiff relies on was issued by Dr. Primeaux on July 5, 2011, and supports the ALJ's determination that plaintiff was disabled after March 1, 2010, but not prior to that date.  Indeed, the pertinent medical records indicate that despite his limitations plaintiff retained the ability to work prior to March 1, 2010.

We find that substantial evidence supports the ALJ's determination that plaintiff was capable of performing light work prior to March 1, 2010.  For these reasons, the court finds that plaintiff's assignments of error three and four are without merit.

### 3.   Did the ALJ err in failing to apply the Medical-Vocational Guidelines?

In his last assignment of error, plaintiff argues that prior to March 1, 2010 he was an individual approaching advance age with a limited education and was limited to less than a full range of sedentary work.  He maintains that according to the Medical-Vocational Guidelines the ALJ was directed to issue a finding of disabled.

The law provides that at Step 5 of the sequential evaluation the ALJ can meet his burden of proving plaintiff can perform work in the national economy by showing his residual functional capacity, age, education and previous work experience match those set out in the Medical-Vocational Guidelines found in 20 C.F.R. Pt. 404, Subpt. P, App. 2.  Section 200.00(a) of Appendix 2 states that "where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled."  The United States Supreme Court has upheld the use of these guidelines in lieu of calling a vocational expert to testify. *Heckler v. Campbell,* 103 S.Ct. 1952 (1983).

Here, after determining that plaintiff was an individual closely approaching advanced age

with a limited education and was able to communicate in English, the ALJ found:

> Prior to March 1, 2010, if the claimant had the residual functional capacity to perform the full range of light work, considering the  claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.11.  The claimant's ability to perform all or substantially all of the requirements of this level of work was impeded by additional limitations.  However, the additional limitations had little or no effect on the occupational base of unskilled light work.  Therefore, prior to the established onset date of disability, a finding of "not disabled" is appropriate under the framework of this rule.

Tr. 25.

Plaintiff contends that prior to March 1, 2010, his RFC limited him to less than a full range of sedentary work.  If we accept this argument, the Medical-Vocational Guidelines would dictate that he was "disabled" if he could perform the full range of sedentary work and if he previously engaged in unskilled work, no work at all, or he engaged in unskilled or semiskilled work but lacked transferrable skills.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.09 and 202.10.

However, we do not find that prior to March 1, 2010 plaintiff was limited to sedentary work.  As explained above, we have determined that substantial evidence supports the ALJ's finding that plaintiff maintained the RFC to perform light work**.**  Thus, we find that the ALJ properly relied upon and appropriately applied the Medical-Vocational Guidelines to determine plaintiff was not disabled.  We conclude that plaintiff's assignment of error five is without merit.

## V.
### CONCLUSION

Based on the foregoing, we find substantial evidence of record and relevant legal precedent support the ALJ's decision that plaintiff is not disabled.   It is therefore RECOMMENDED that the ALJ's decision be AFFIRMED and this matter be DISMISSED with prejudice.

Under the provisions of 28 U.S.C. §636(b)(1)(C), the parties have fourteen (14) days from receipt of this Report and Recommendation to file any objections with the Clerk of Court. Timely objections will be considered by the district judge prior to a final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING ON APPEAL, EXCEPT UPON GROUNDS OF PLAIN ERROR, THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT.**

THUS DONE AND SIGNED in Chambers this 30th day of March, 2015.


_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE